2006 ND 256

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Brant WARDNER, Defendant and Appellant.**

**No. 20060014.**

Supreme Court of North Dakota.

Dec. 18, 2006.

216

Ross L. Sundeen, State's Attorney, Watford City, N.D., for plaintiff and appellee; submitted on brief.

Paul H. Myerchin, Bismarck, N.D., for defendant and appellant; submitted on brief.

SANDSTROM, Justice.

[¶ 1] Brant Wardner appeals the district court's second amended criminal judgment revoking his probation and imposing the originally suspended seven-year prison sentence for gross sexual imposition with his four-year-old stepdaughter. Holding that the requirement for a presentence investigation and report was met and that Wardner had been advised of the proscribed conduct, we affirm.

I

[¶ 2] In 2001, Wardner pled guilty to gross sexual imposition with a four-year-old child, a class A felony under N.D.C.C. § 12.1–20–03(1)(d). The plea was the result of a written plea agreement. The

district court ordered a presentence investigation and report. After receiving this first presentence investigation, the district court accepted the plea agreement and suspended the execution of a seven-year sentence, placed Wardner on supervised probation, and ordered outpatient sexual abuse treatment at the Badlands Human Service Center.

[¶ 3] In August 2001, Wardner began treatment at the Human Service Center. In December 2004, the Center expelled Wardner for mistreating the staff and disrupting group therapy sessions. The State moved to revoke his probation for his failure to complete the treatment. At the revocation hearing in February 2005, Wardner admitted the violation. The district court found a factual basis for the admission, accepted it, and ordered a second presentence investigation. The district court also ordered a psychological evaluation of Wardner and a dispositional hearing upon its completion.

[¶ 4] In April 2005, the probation division submitted a second presentence investigation report to the district court. In August 2005, the district court held a "sentencing hearing" and again suspended execution of the seven-year sentence, adding more probation conditions:

2.....

B. The Defendant shall not be allowed under any circumstances to live with any child under the age of ten years old, including his own children, unless authorized by his Parole/Probation Officer.

C. The Defendant shall receive psychological treatment for his sexual deviancies....

D. *That Defendant's contact with his children should be monitored in a way to ensure the children's safety. All contacts should be in conjunction with a safety plan put in place by his psychologist, his faith-based treatment provider and Parole/Probation officer.*

*. . . .*

(emphasis added). Appendix "A" to the criminal judgment restricted interaction with children:

25. You shall not initiate, establish or maintain contact directly or indirectly, with any child under the age of 18, or attempt to do so, except under circumstances approved in advance and in writing by your Probation Officer.

. . . .

28. [You may not] go to or loiter near schoolyards, parks, playgrounds, arcades, or other places primarily used or visited by minors.

29. [You may not] obtain employment with any agency or place of business that provides services for the care or custody of minors . . . .

. . . .

33. [You may not] date or socialize with anybody who has children under the age of 18 years besides your wife, unless pre-authorized by your parole/probation officer.

[¶ 5] In October 2005, the State again moved to revoke Wardner's probation when it learned that he had had contact at church with his previous victim. In December 2005, the district court held a revocation hearing and found Wardner violated condition 2D of his probation for failing to have an approved safety plan in place before having contact with children. The district court revoked Wardner's probation and imposed the seven-year prison sentence.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. This appeal is timely under N.D.R.App.P. 4(b). This Court

has jurisdiction under N.D. Const. art. VI, § 2, and N.D.C.C. § 29–28–06.

## II

[¶ 7]   Wardner argues the district court erred by not ordering another presentence investigation and a risk assessment before imposing the previously suspended seven-year prison term in December 2005.

[¶ 8]   Generally, a district court may order a presentence investigation and report at any time, but is not required to do so. N.D.R.Crim.P. 32(c)(1).   Section 12.1–32–02(11), N.D.C.C., however, provides:

> Before sentencing a defendant on a felony charge under section 12.1–20–03 . . . , a court shall order the department of corrections and rehabilitation to conduct a presentence investigation and to prepare a presentence report.   A presentence investigation for a charge under section 12.1–20–03 must include a risk assessment.   A court may order the inclusion of a risk assessment in any presentence investigation. . . .

Wardner argues that "sentencing" includes revocation of probation and that the district court was required to order a new presentence investigation and risk assessment before it revoked his probation and imposed the previously suspended seven-year prison term.   Wardner also argues that if the presentence investigation was not mandatory, the information in the two existing presentence investigation reports was stale, so the district court was required to order another presentence investigation prior to imposition of the seven-year prison sentence.   The State argues there was no right to an additional presentence investigation, and if there was, Wardner waived it by agreeing to proceed directly to sentencing.

[¶ 9]   The interpretation of a statute is a question of law, which is fully reviewable on appeal.   *State v. Stavig,*

2006 ND 63, ¶ 12, 711 N.W.2d 183. "Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears, but any words explained in this code are to be understood as thus explained."   N.D.C.C. § 1–02–02.   "When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." N.D.C.C. § 1–02–05.

[¶ 10]   "Sentencing" is "the determination of the sentence."   1 La Fave, Israel & King, *Criminal Procedure* § 1.3(r) (2d ed.1999).   In ordinary terms, "sentencing" means "to pronounce judgment or punishment upon (a convicted person);   condemn (to a specified punishment)."   *Webster's New World Dictionary* 1297 (2d ed.1980).

[¶ 11]   "Resentencing" is the "act or an instance of imposing a new or revised criminal sentence."   *Black's Law Dictionary* 1309 (7th ed.1999);   *see, e.g., Peltier v. State,* 2003 ND 27, ¶ 13, 657 N.W.2d 238 (referring to a district court's "resentencing" to a harsher sentence after revocation of probation); *Davis v. State,* 2001 ND 85, ¶ 11, 625 N.W.2d 855 ("Under N.D.C.C. § 12.1–32–07(6), a trial court is authorized to resentence a defendant who violates a condition of probation to any sentence that was initially available. . . .").   The term "resentencing" also applies to a district court's sentencing on remand from appellate review.   5 LaFave, et al., *Criminal Procedure* § 26.7(b)   (2d ed.1999); *State v. Trieb,* 533 N.W.2d 678, 681 (N.D. 1995).

[¶ 12]   In this context, "before" means "prior to."   *Webster's New World Dictionary* 127 (2d ed.1980).

[¶ 13]   The   statute,   N.D.C.C. § 12.1–32–02(11), requires that a presen-

tence investigation in cases of gross sexual imposition be conducted before sentencing. By definition, sentencing is prior to resentencing. In this case a presentence investigation was conducted prior to—before—sentencing, and the plain language of the statute has been complied with.

[¶ 14] We recognize that some states—such as California—require new or updated presentence investigations before resentencing. *See People v. Dobbins*, 127 Cal.App.4th 176, 24 Cal.Rptr.3d 882, 884–85 (2005); *People v. Hess*, 241 Ill.App.3d 276, 182 Ill.Dec. 68, 609 N.E.2d 371, 376 (1993); *State v. Triplett*, 407 Mich. 510, 287 N.W.2d 165, 165–66 (1980). The North Dakota Legislature has not chosen to do so.

[¶ 15] The district court complied with the statute.

### III

[¶ 16] Wardner argues that condition 2D of his probation contains ambiguous terms, making the approved safety plan optional, and that his actions did not rise to "contact" under the condition. In the alternative, Wardner argues that his probation revocation was unwarranted for such "a de minimus" violation caused by his attending church and sitting with his wife and children, including his victim. The State argues, and the district court found, that Wardner violated condition 2D because he had not obtained an approved safety plan prior to attending the church where he knew his victim and other children attended. The district court revoked Wardner's probation and imposed the previously suspended seven-year prison sentence set forth in the plea agreement.

[¶ 17] In an appeal of probation revocation, we first review the district court's factual findings and then review the district court's decision to revoke probation. *State v. Causer*, 2004 ND 75, ¶ 30,

678 N.W.2d 552, *cert. denied*, 543 U.S. 906, 125 S.Ct. 139, 160 L.Ed.2d 182 (2004).

[¶ 18] Although due process protection applies, "[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution." *State v. Olson*, 2003 ND 23, ¶ 14, 656 N.W.2d 650 (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)). Consequently, a probationer facing revocation has limited rights. *Olson*, at ¶ 14 (internal citation omitted); *see, e.g., State v. Schlosser*, 202 N.W.2d 136, 139 (N.D.1972) (holding that a probationer's Fourth Amendment rights were limited by that status). In *State v. Ennis*, this Court summarized those rights:

> The probationer is entitled to written notice of the claimed violations of his probation; disclosure of the evidence against him; an opportunity to be heard in person and to present witnesses and documentary evidence; a neutral hearing body; and a written statement by the factfinder as to the evidence relied on and the reasons for revoking probation.

464 N.W.2d 378, 384 (N.D.1990) (citation omitted). When revocation is contested, the State need only prove a probation violation by a preponderance of the evidence. N.D.R.Crim.P. 32(f)(3)(B). " 'Given the previous conviction and the proper imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole.' " *Olson*, 2003 ND 23, ¶ 14, 656 N.W.2d 650 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

### A

[¶ 19] First, we review the district court's factual finding of a proba-

tion violation under the clearly erroneous standard. *Causer*, 2004 ND 75, ¶ 31, 678 N.W.2d 552. "A finding of fact is clearly erroneous when it is induced by an erroneous view of the law, when there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence, the court is left with a definite and firm conviction that a mistake has been made." *State v. Oien*, 2006 ND 138, ¶ 11, 717 N.W.2d 593 (citing *State v. Nelson*, 2005 ND 59, ¶ 4, 693 N.W.2d 910). The district court determines the credibility of witnesses; therefore, this Court will not substitute its judgment for the district court's when there is testimony to support its findings. *State v. Toepke*, 485 N.W.2d 792, 795 (N.D.1992).

[¶ 20] The condition at issue on appeal, taken from the second presentence investigation and expressed in paragraph 2D of the district court's judgment rendered on August 5, 2005, required:

> [t]hat Defendant's *contact* with his children *should* be monitored in a way to ensure the children's safety. All *contacts should* be in conjunction with a safety plan put in place by his psychologist, his faith-based treatment provider and Parole/Probation officer.

(emphasis added). At the revocation hearing in December 2005, the probation officer testified that she did advise Wardner concerning condition 2D:

> it was August 22nd, and Brant and I spoke on the telephone, and I had talked with him specifically and advised him that he's not to have any contact—any further contact with his kids until we get a safety plan approved by me and by his psychiatrist unless he wanted to go to the Family Connections. [Wardner] refused to go through the Center and agreed that he would not have any contact with his kids. That was through a phone conversation on the 22nd.

> . . . .

> I said what was in place before the revocation is no longer. There is no contact with your kids now. You're not to have any contact with your kids, and then at that point, I gave him the option of the Family Resource Center. That that would be a third party supervised visit. . . .

The probation officer testified that during an office visit on August 26, 2006, Wardner requested permission to attend church "with his family." The probation officer testified that she granted the request believing that "family" meant only Wardner's parents and again warned Wardner to avoid contact with children:

> [Probation Officer:] During that meeting, [Wardner] had asked if he could go to church with his family, and his family had always been his parents. I never—I never knew—I don't know if I can say this or not—but I didn't know that their church had only one service, and I didn't find that out until after he was released on bond, so when I approved him to go to church with his family, which I thought was his parents, I was also apparently giving him authorization to go to church with his children, that I was not aware of because it was never made clear to me, Debbie, this is one mass. This is only one time a week, and [Wardner's] children go to this service. I was not aware of that until after the bond release.

> . . . .

> I told him I can't prohibit him from going to church . . . so I told him he could go to church as long as we would get a safety plan in place, and that he would follow safety plans for public places, which would be stores, groceries, and to church. Now, I never did get that safety plan until November, so I never had anything that would show me

that this was already in place, and able to work with, so that wasn't an option. The district court questioned the probation officer about the meaning of "family":

> [Probation Officer]: There was no discussion about what family meant as far as who he would go to church with, but in these same conversations, it was strongly emphasized that he was not to have any contact with his kids. In fact, options were given for him in these same conversations to go to the Family Resource Center to have a third party supervise these visits, so in the same visit I'm saying you can't have any contact with your kids unless you want to go to this place and have it supervised by a third person. Okay. Change of subject. Can I go to church? Yes, you can go to church. Can I go to church with my family? Yes, you can go to church with your family, but we need to have a safety plan in place. Last one in, first one out. No contact with kids, so you don't sit by one. If one initiates contact with you, you get up and excuse yourself politely. You leave, so in the realm of the conversation, it's made clear that he's not to have any contact with his kids, even so that if he did go to church, he would make sure that he didn't have contact with other people's kids.

Wardner did not testify at the December 2005 revocation hearing.

[¶ 21] Wardner argues that because the word "should" was used rather than "must" or "shall," the terms of condition 2D were optional.

[¶ 22] Interpretation of a condition of probation is a question of law, fully reviewable on appeal. *State v. Krous*, 2004 ND 136, ¶ 14, 681 N.W.2d 822. Although conditions of probation are to be strictly construed in favor of the offender, *State v. Monson*, 518 N.W.2d 171, 173

(N.D.1994), conditions of probation are construed as mandatory, not as hortatory, because of the "responsibility to regulate a probationer's activities to help in his rehabilitation and at the same time to guard against continued criminal behavior." *Schlosser*, 202 N.W.2d 136, 139 (N.D.1972).

[¶ 23] That "should" is an auxiliary verb that can have different meanings in some other contexts does not necessarily make it ambiguous in the context of a probation condition. "Should" is the past tense of "shall." *Webster's New World Dictionary* 1318 (2d ed.1980). As an auxiliary verb, it "helps form tenses, aspects, moods, or voices of other verbs, as have, be, may, can, must, do, shall, and will." *Id.* at 96. Used as such, it expresses obligation, duty, expectation or future condition. *Id.* at 1318. "In formal speech the distinctions between *should* and *would* are the same as those between *shall* and *will*." *Id.* Although, in some contexts, "should" can express "mere appropriateness, suitability, or fittingness," Bryan A. Garner, *Dictionary of Modern Legal Usage* 628 (2d ed.1995), or even be "hortatory," Legislative Council, *North Dakota Legislative Drafting Manual 2007* 97 (2006), the Random House Dictionary explains, "the main function of should in modern American English is to express duty, necessity, etc." *Random House Dictionary of the English Language Unabridged* 1771 (2d ed.1987). Furthermore, courts have used "should" and "shall" or "must" interchangeably. *See, e.g., Lynn v. State*, 251 Ga.App. 155, 553 S.E.2d 836, 837–38 (2001) (denying a new trial when a court instructed the jury that it "should acquit" if it found reasonable doubt as to the defendant's guilt, rather than stating that the jury "must acquit"); *State v. Lovelace*, 227 Kan. 348, 607 P.2d 49, 55 (1980) ("[T]he two words [must and should] can be used interchangeably in criminal instructions. Both

convey a sense of duty and obligation."); *State v. Redden*, 71 Wash.2d 147, 426 P.2d 854, 857–58 (1967) ("the use of the word 'should' in the instruction instead of the word 'must'" did not mislead the jury because the court "approved both forms of this instruction on circumstantial evidence"). Of course,

> there is great value in making all conditions of release clear and capable of being understood by the offender in order that he knows exactly what is expected of him. When the conditions of probation proscribe acts that are not criminal, due process requires that the probationer receive actual notice that his acts could lead to revocation.

*Monson*, 518 N.W.2d 171, 173 (N.D.1994) (internal quotations and citations omitted). The question is: "Was the offender given fair notice of the proscribed conduct?" *State v. Drader*, 432 N.W.2d 553, 555 (N.D. 1988).

■ [¶ 24] The record is replete with admonitions to Wardner by the probation division and the district court regarding the conditions of his probation. Condition 3 of his probation makes clear that condition 2D is mandatory: "If the Defendant fails to fulfill any term or condition set forth above, he shall be returned to the Court for further proceedings to consider revocation of the Court's order and the immediate imposition of sentence, or penalty, or both." Furthermore, the condition at issue directly relates to Wardner's underlying conviction of gross sexual imposition with a child. The proscribed conduct was having contact with children without an approved safety plan. This applied to all situations where contact with children could have occurred, including attending church. That Wardner understood this is evidenced by a fax he sent to his previous attorney on August 29, 2005:

I can now do the following things per the words of [the probation officer]:

1. I can go out into public with out [sic] my parents.

2. I can go to restaurants, golfing, Medora, shopping with my wife and friends as long as children are not with us.

3. I can go to church. But I have to submit a safety plan because my wife and I go to the same church.

4. I will and do follow the sentencing agreement.

Wardner also handwrote a safety plan that he dated August 27, 2005:

August 27, 2005

Safety Plan for Church

Per/[Probation Officer]

Arrival/Pre–Church

1. I will either ride w/my parents or drive myself to church

2. During this time I will [illegible] always be in the presence of at least one adult & will never be in a room alone w/a minor.

3. If I do have to leave the room, I let an adult know where I am going (i.e. bathroom)

During Church

1. I will sit with my Parents

2. If I have to leave the sanctuary, I let my parents know where I am going (i.e. bathroom)

After Church

see the "Arrival/Pre–Church["]

*Notes:*

I will not go into the Nursery or classrooms.

If I do have contact w/ a minor, I will politely excuse myself and either leave the building or find a group of adults

If I do have contact w/ my children, I will acknowledge them & give them attention, but excuse myself [illegible] so it's convenient.

The record does not reveal what became of this plan other than the probation officer's testimony that she "never did get that safety plan until November [2005,]" a month after Wardner had contact with his victim. Wardner did not ask for permission to attend just any church. Wardner asked to attend the church he knew his family attended, which had only one weekly service. As the district court found, Wardner "knew he was not supposed to go without a safety plan [and he] went without a safety plan."

[¶ 25] Wardner also argues that "contacts" is ambiguous, although he used that word in his handwritten safety plan and checked the box marked "yes" on his monthly probation report that asked: "If victims were involved in your case, did you have any contact with them." In *State v. Monson,* we addressed the meaning of "contacts" used in the context of a sexually-based offense, and applied the ordinary definition of that word as " '[t]he coming together or touching of two objects' or '[t]he state of being in communication.' " 518 N.W.2d 171, 173 (N.D.1994) (quoting *American Heritage Dictionary* 315 (2d College ed.1985)). In that case, we reversed the district court's finding that Monson violated the "no-contact" condition of his probation when he attended a basketball game in which his victim was a player. *Monson,* 518 N.W.2d at 174. Construing the probation condition strictly against the government, we reasoned that because the probation officer advised Monson that attending the same church as the victim would not violate his probation, without further guidance or instruction, it was reasonable for Monson to conclude that he could attend his victim's basketball game. *Id.* Although *Monson* appears to be similar to this case, it is easily distinguishable. Wardner did receive those "more specific instructions" required but found fatally missing by the *Monson*

Court. *Id.* ("Without more specific instructions to Monson, Monson's belief that he could attend the victim's basketball games was not unreasonable under the circumstances."). Wardner's no-contact condition required him to obtain an approved safety plan prior to any potential encounter with children. Wardner could attend any church, including that of his victim, but had to have a plan, tailored to the specific circumstances of the event, to avoid violating condition 2D. More damaging to Wardner's argument is that the *Monson* Court construed Monson's no-contact condition to mean "to touch or to communicate." *Id.* ("Therefore, we must construe the no-contact condition in favor of Monson and according to the ordinary meaning of 'contact,' to touch or to communicate."). At the December 2005 revocation hearing, the district court questioned the probation officer about the type of "contacts" Wardner had with his children at church:

[Probation Officer]: He said that he would come to church with his—parents—with his parents, and that [his wife] and the kids would come in shortly thereafter and join them, and that they would have their opening services, and then the children would leave for Bible study or something, somewhere else in the church. That they would join him near the end of services, and then he never said if they left directly from there or if they had any further contact after that, so I don't know exactly how much time he spent with his children. I would assume it would be a short period of time.

THE COURT: What is—did he explain what "joining him" meant?

[Probation Officer]: I assumed it was to join him like in the same pew. I think he might have said that. That they come in, and they join him and his par-

ents sitting there, and then his children go off and go into theirs, and then come back at the end of services.

The potential for Wardner to "touch or communicate" with his victim while sitting next to her in a church pew far exceeds that same potential when the offender sits in the stands at a basketball game where the victim is a player. Moreover, the violation at issue here goes more toward the absence of a safety plan "put in place by his psychologist, his faith-based treatment provider and Parole/Probation officer" than what contact Wardner had or could have had at church. The meaning or context of "contacts" would have likely been defined in that plan; however, Wardner asked for permission to attend church without having any of the required probation authorities or mental health professionals review his self-created plan. The district court's factual finding of a probation violation was not clearly erroneous.

### B

[¶ 26] Next, we apply the abuse-of-discretion standard to review the district court's decision that revocation of probation was warranted. *Causer*, 2004 ND 75, ¶ 32, 678 N.W.2d 552. A district court abuses its discretion when it acts in an arbitrary, unreasonable, unconscionable, or capricious manner, or if its decision is not the product of a rational mental process leading to a reasoned determination, or if it misinterprets or misapplies the law. *State v. Clark*, 2001 ND 194, ¶ 8, 636 N.W.2d 660; *State v. Kensmoe*, 2001 ND 190, ¶ 7, 636 N.W.2d 183.

[¶ 27] The district court imposed the seven-year prison sentence provided in the written plea agreement after Wardner had violated the conditions of his probation for the second time. First, he was expelled from the Center. Second, he had contact with children, including his victim, without an approved safety plan. Furthermore, a district court is allowed the widest range of discretion in sentencing, and appellate review of the sentence itself focuses only on whether the district court "acted within the limits prescribed by statute, or substantially relied on an impermissible factor." *State v. Ennis*, 464 N.W.2d 378, 382 (N.D.1990). The district court sentenced Wardner to seven years' imprisonment, within the statutory limit of 20 years and consistent with the written plea agreement. The district court sentenced Wardner within the limits of N.D.C.C. § 12.1–32–01(2). Nothing in the record indicates the district court relied on an impermissible sentencing factor. The district court did not abuse its discretion.

### IV

[¶ 28] We affirm the second amended criminal judgment of the district court.

[¶ 29] GERALD W. VANDE WALLE, C.J., BENNY A. GRAFF, S.J., DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.

[¶ 30] The Honorable BENNY A. GRAFF, Surrogate Judge, sitting in place of KAPSNER, J., disqualified.